**SO ORDERED.**

**SIGNED this 18th day of September, 2024.**



Dale L. Somers
United States Chief Bankruptcy Judge

___

Designated for online publication only
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

Lodging Enterprises, LLC,

                Debtor.

Case No. 24-40423
Chapter 11

**Memorandum Opinion and Order Addressing the United States
Trustee's Objection to Debtor's
Motion for Waiver of Compliance with § 345(b)**

Debtor Lodging Enterprises, LLC moves for authorization to continue to use its prepetition Cash Management System. Among other things, in the motion Debtor seeks a permanent[1] waiver of § 345(b),[2] for two deposit

___

[1] Temporary waivers were granted in the interim orders on the Cash Management Motion.

[2] 11 U.S.C. § 345(b). Future references to Title 11 shall be to the section only.

1

Case 24-40423    Doc# 239    Filed 09/18/24    Page 1 of 9

accounts, its Operating Account at Intrust Bank and its Cash Management Account at Wells Fargo. Except for deposits that are insured by the United States, § 345(b) directs the debtor in possession to require from an entity in which estate funds are deposited a surety bond or collateralization of the deposit by approved securities, "unless the <u>court</u> for cause orders otherwise."[3] Debtor contends that cause exists to excuse compliance with § 345(b) as to its Operating Account and its Cash Management Account. The United States Trustee (UST) objects, contending that surety bonds should be posted. An evidentiary hearing was held on August 29, 2024.

Mr. Bryon Gaston, a member of the proposed financial advisor to Debtor, submitted an affidavit and testified in support of Debtor's request. Debtor has a complex Cash Management System. The management and oversight of Debtor's Cash Management System is performed by the accounting personnel employed by Aviant, Debtor's Manager. Debtor's Cash Management System utilizes forty-one different bank accounts as follows: the Clearing Account comprised of three deposit accounts at PNC National Bank; the Cash Management Account at Wells Fargo; the Operating Account at Intrust Bank; and thirty-six deposit accounts at local banks as depositories for cash receipts from Debtor's hotels and restaurants. Under Debtor's loan

---

[3] § 345(b) (emphasis added).

2

agreement, all "rents" are deposited into the Clearing Account, and all of the funds in the Clearing Account are swept daily into the Cash Management Account, established for the benefit and under the control of Debtor's secured lenders. From March through July 2024, the highest monthly balance in the Cash Management Account was approximately $22 million and the average monthly balance was between approximately $15 and $18 million. Funds are transferred from the Cash Management Account to the Operating Account, under the control of Debtor, for the payment of Debtor's operating expenses. From March through July 2024, the highest monthly balance in the Operating Account was between approximately $85,000 and $5 million and the average monthly balance was between $38,000 and $4 million.

Debtor's advisors have undertaken efforts to obtain compliance with § 345(b) through the methods stated in the statute and also nontraditional methods, which ultimately were not acceptable to the UST. Both Wells Fargo and Intrust Bank are not willing to post collateral at the Federal Reserve to secure Debtor's deposits. Obtaining surety bonds was explored. Wells Fargo indicated it would take an extended period of time before it could obtain the internal approval necessary for execution of certain of the agreements required to obtain a security bond. As of the day before the hearing, Intrust

Bank had not definitively stated whether it was agreeable to obtaining a surety bond.

Mr. Gaston testified that compliance with § 345(b) would impose significant additional work on the accounting personal employed by Aviant, thereby creating a risk of attrition of personnel. The nature of that additional work was not explained. Likewise, no specifics were provided in support of Debtor's assertion that compliance would risk unexplained operational disruptions which could result in loss of business.

The Code does not define "cause" for excusing compliance with the requirement that all funds be FDIC insured, collateralized, or bonded. A court in *Service Merchandise* adopted a totality of the circumstances inquiry, and enumerated the factors to be considered.[4] Applying these factors, the court found "cause" for waiver. The debtors were large and sophisticated,

---

[4] *In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 2019). The enumerated factors are:
> 1. The sophistication of the debtor's business; 2. The size of the debtor's business operations; 3. The amount of investments involved; 4. The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor-in-possession funds are held; 5. The complexity of the case; 6. The safeguards in place within the debtor's own business of insuring the safety of the funds; 7. The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; 8. The benefit to the debtor; 9. The harm, if any, to the estate; and 10. The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

*Id.* Only three reported decisions cite *Service Merchandise.*

4

with a complex cash management system. They relied on multiple banks and multiple accounts to handle millions of dollars on a daily basis. The debtors had internal monitoring mechanisms that would "detect the impending failure of any bank in which large amounts of funds were deposited"[5] and had the ability to remove funds in excess of the FDIC insured amount when a problem was suspected. In addition, the debtors' ability to reorganize would not have been materially affected by the failure of any one financial institution. The court found the benefit to the debtors from waiving the § 345(b) requirements far outweighed any harm to the estate.

In *Ditech Holding Corp*,[6] the court also applied a totality of the circumstances test, although it did not apply the factors identified by *Service Merchandise*. The debtors, an originator and servicer of mortgage loans and reverse mortgages, utilized approximately 1,200 bank accounts spread among six banks, including 532 accounts at Citibank, five of which were the primary operating accounts. The UST objected to the debtors' request to exempt these five accounts from the § 345(b) requirements. The court found the debtors' business was large and sophisticated, its cash management system was complex, and it would have been costly, time consuming, and

---

[5] *Id.*

[6] *In re Ditech Holding Corp.*, 605 B.R. 10 (Bankr. S.D.N.Y. 2019).

5

risky to transfer the debtors' primary accounts from Citibank to another institution. Unlike *Service Merchandise*, which utilized multiple banks and whose funds could be quickly moved to another institution, the *Ditech* debtors had their primary accounts at one bank, where its daily deposits aggregated $95 million. The court agreed with the debtors that the Citibank accounts were integral to the debtors' operations, that moving the accounts would be an expensive, complex, and potentially risky operation, and there was not a meaningful risk of loss if the accounts stayed at Citibank, although even a minor disruption in access to the Citibank deposits would be disruptive of the debtors' operations and ability to reorganize. The court found the following factors weighed in favor of mandating compliance: the substantial value of the Citibank accounts; the structure of the debtors' cash management system; and "the risk of severe negative effects on the Debtors' liquidity, business operations, and reorganization efforts in the event of any 'hickups' with the Citibank Accounts."[7] In addition, after the debtors filed their motion for waiver of the § 345(b) requirement, Citibank had agreed to collateralize the debtors' deposits, providing the debtors underwrote the cost of doing so. The court concluded that by continuing to pursue waiver, the debtors wanted the court to excuse them from their statutory obligation

---

[7] *Id.* at 21.

under § 345(b) so they could avoid the financial burden of the deal they negotiated with Citibank. Because the debtors had failed to establish "cause" to excuse them from collateralizing the Citibank accounts, the waiver motion was denied.

In this case, Debtor argues cause exists for waiver of the § 345(b) requirements. As in both *Service Merchandise* and *Ditech*, Debtor's business is sophisticated, its Cash Management System is complex, and movement of the two accounts at issue to different banking institutions would be extremely disruptive. But Debtor's evidence is more similar to that in *Ditech* than in *Service Merchandise*. First, Debtor argues that cause exists in this case because the risk of loss of deposits at Wells Fargo and Intrust Bank is virtually nonexistent. Second, Debtor asserts that complying with § 345(b) risks disrupting Debtor's operations and imposes administrative burdens. Third, Debtor argues that its business is large and uniquely susceptible to harm from operational disruption.

The Court finds Debtor has not demonstrated cause for waiver of compliance with § 345(b). Although administrative burdens and significant operational disruption would result if Debtor were required to move all of its moneys to FDIC insured accounts, § 345(b) imposes no such requirement. Section 345(b) can be satisfied by Wells Fargo and Intrust Bank obtaining

surety bonds. The UST urges this solution is cheap[8] and simple; the UST does not suggest Debtor must modify its Cash Management System. It appears that like the *Ditech* debtors, Debtor in this case is pursuing waiver to avoid the cost and inconvenience of compliance with § 345(b). This cannot be the basis for excusing compliance. When enacting § 345(b), Congress certainly was aware that bank failures are very rare and compliance could be costly, yet it still required that deposits in excess of the FDIC insured amount be collateralized or bonded without regard to the financial strength of the depository institution. Wells Fargo and Intrust Bank may be reluctant to obtain surety bonds, and Debtor may seek to avoid the cost of administration, but obtaining a bond or collateralization is what the Code requires. Neither bank has refused to obtain a bond. The unfortunate reality is that filing a Chapter 11 case comes with unwelcome burdens, some of which may appear nonsensical.

The Court finds Debtor failed to establish cause for permanent waiver of § 345(b) with respect to its Cash Management Account at Wells Fargo and its Operating Account at Intrust Bank. The waiver request is denied without prejudice. Debtor is directed to diligently pursue obtaining surety bonds for the two accounts. The Court further directs Debtor to prepare a fourth

---

[8] The UST stated that a twelve month bond would cost $750 per million.

interim Cash Management order for the period from September 30, 2024, when the current order[9] expires, to December 31, 2024.

This matter is set for status hearing to discuss progress on December 19, 2024, at 10:00 A.M.

**It is so ordered.**

###

---

[9] Doc. 212.